Good morning, Your Honors. May it please the Court, Rebecca Jones appearing on behalf of Appellant Alfred Villalobos. I would like to reserve two minutes for rebuttal, please. Keep track and it counts down. I'll try to do that. Thank you. This case presents two issues in particular that have not been addressed head on by any published case that we can find. One is whether you can exert a claim of right defense to threats of criminal prosecution. And the other is whether a person commits obstruction of justice if they're talking about or thinking about providing false information to a U.S. attorney without there having been a grand jury subpoena issued to that witness. I want to address the extortion claim of right issue first. No case has examined alleged threats of criminal prosecution and found that they cannot be defended by a claim of right in an extortion prosecution. Why do you think this case involves a threat of criminal prosecution? Because there were discussions about were Angel possibly telling the U.S. attorney about the visa fraud committed by the rabbi and also potentially about wage infractions or actually possibly extortion by him because he was forcing her, the allegation was that he was forcing her to return her legitimately earned payments. Wasn't she just tell me if I got the facts of this wrong, but I read it as her saying, look, I'm going to otherwise tell the truth and that's going to be bad for you. But if you pay me this money, I'm happy to lie. I'll help you out. Correct. Okay. Well, that to me doesn't sound like a threat of criminal prosecution. It just sounds like a threat to manipulate the judicial system in some way that will help you. It just seems to me wrongful, just like a threat of violence would be wrongful to extort money. Well, if she would tell the truth, that would further the criminal prosecution theoretically against the rabbi. So I think that's the way it was being interpreted, and that's why it was being characterized by the parties in the trial court as threats of criminal prosecution, and that's why there was a jury instruction saying threats of criminal prosecution are inherently wrongful and therefore. I guess my problem is why would we ever say that you have a right? Let's assume that her claim for the money was valid. Correct. Why would we want to sanction somebody saying I'll lie as part of this criminal investigation? That's the leverage I'm going to use to get the money from you. It just seems like why would you have a right to do that? Well, okay, so I understand your question now better, and I apologize for not understanding it before. I am not saying that it was a defense for her to say that she was going to lie to the U.S. attorney if the rabbi gave her money. What I'm trying to say is that Mr. Villalobos' defense was I was engaging in legitimate civil negotiations to resolve an employment law claim, and I was explaining to opposing counsel that if we didn't resolve this, that she was going to go in and tell the truth, and it was going to hurt him. Now, if the jurors believed that he was saying, you know, if you give me the money, therefore we're going to be sure that we lie and we exonerate you, you know, that might have been. Isn't that what the facts are? There's very little in there. And what I was going through comparing the government's brief to try to figure out exactly what lies she was or Mr. Villalobos was saying that his client would make, and actually it was just talking a little bit more about withholding additional information that the government didn't already know about. Well, let's shift the focus a little bit. Let's assume for a moment, arguendo, that the claim of right exists in this context. Correct. I'm not saying I agree with that, but let's say it does. How do you square what Mr. Villalobos asked for with being a claim of right? His claim is, you know, I'm an attorney. I'm representing this young lady. I want to, you know, protect her and so on, and I'm trying to work that out. But what he asked for had nothing to do with her. He asked for, for example, cash payments, a fraudulent charitable donation receipt, and other compensation. What does that have to do with his client? Well, the cash payments were for his client. The cash payments were the back wages. Let's say that's what a charitable contribution is. A charitable contribution is definitely a problem, but I guess the question is whether the jurors are going to credit that or not, and do you say he cannot defend against the $100,000 or $120,000 of cash payments? Are you going to take that defense completely off the table because there's that one statement supposedly that he's … He didn't even know, acknowledge, he didn't even know how much money was involved with Ms. Ortiz and the rabbi, did he? I believe he provided them with, excuse me, 1040s tax forms. Well, that may be, but when he was questioned at some point in the proceeding, he basically wasn't sure. It looks to me like what he asked for was clearly for him, and I'm having difficulty squaring the concept of even if there is a claim of right in this context, that this, which seems to be inherently wrongful, could possibly qualify as a claim of right. Or am I missing something? I think there was quite a bit of evidence, and I tried to point it out in my briefs, and I don't have all the citations right in front of me, but she made money and made about $100,000 to $120,000 over a period of years and had to kick most or all of that back to the rabbi. So I think there's actually quite a bit of evidence in the record to show that that chunk could have been seen as a legitimate … Let's make a real stretch and say that the cash payments were that. Yes. What does the charitable contribution receipt, which I think was for $6,000, have to do with her? That's a problem. It's a real problem, isn't it? It is a real problem. You can't really, under any stretch of any theory that I'm aware of, claim that that was a claim of right that he asserted as an attorney on behalf of his client. Is that right? I would have difficulty, yes, arguing that. So arguably, even if it does, here's a claim of right, you've got a problem there. He has a problem there. He has a problem there. But again, my concern is to foreclose. First of all, I think whether he made that claim. The evidence was there. I mean, that's for the jury to determine whether they believe it, but the evidence was there. Right, but for the jury to determine the credibility of these allegations, and they're not given the framework to credit his defense as to the vast majority of the rest of the negotiations and the rest of the money requested. I mean, this is not a sufficiency claim. This is shutting down the defense, not giving a defense instruction, not allowing defense counsel to make the argument. And so I don't think that this court is permitted to say, well, geez, we think the evidence shows overwhelmingly that he's guilty, therefore he shouldn't have been allowed to put the defense on. That's where my concern is. I understand that the charitable donation comment is a serious problem. I'm not disputing that. But I think the vast majority of the case was focusing on other activity, on other discussions. Your argument is, if the jury had believed that she truly was entitled to, I'll call it $120,000 in back wages, that she had been required to kick back to the rabbi. Correct. And if the jury had been told, listen, if you determine, you the jury, determine that she was entitled to $120,000, she had a right to that money, and it is a defense to extortion if all she's asking for is a right to the money. You're saying that they might have viewed the charitable donation, and maybe some other things as well, differently. That's the argument. Yes. Thank you. You said that much better than I did. I'm not sure I did, but I want to make sure I understood the argument. I got it. No. Yes. And, again, to shut down, the main point is that it foreclosed an entire defense, pretty much the only defense that he had to this. I mean, he was trying to say that some of these conversations that preceded the recordings didn't happen the way Mr. Block said they did. I understand more the claim of right. Is it a claim of right because of the contract she has with the rabbi? Because it sounds like the contract with the rabbi is, I'll let you people stay in the country if you agree to the following arrangement. I mean, I don't think the rabbi was going back on the deal he had with her, according to the evidence that I saw. It was a kind of crummy deal, and the rabbi wasn't behaving very well, and maybe the rabbi, in fact, should have been criminally prosecuted. That didn't seem to go very far. But is the claim of right based upon contract with the rabbi? Did the rabbi say that he owes $120,000? Yes, and I believe that the evidence is not particularly clear whether there was an agreement before he applied for the fraudulent visa that she was going to kick back all the money, or he applies for the fraudulent visa for her, she comes over, she does some work, but it's not work that qualifies for the religious visa, and then he says, okay, I got you under my thumb, now give me the money back, or you're going back to Israel. I don't know that the timing at all. But it's not as though he never paid the money. He paid the money, and then it was kicked back. But under duress. I mean, I believe the testimony from Ms. Angel's husband was that they gave the money back because they were forced to give the money back, not because they wanted to give it. Because they didn't want the adverse consequences that would flow, and what they were enjoying as long as they were kicking the money back was the benefit that they appeared to have contracted for, which was that she gets the fraudulent visa. Whether that was the contract or not, I think, is a question for the jury under proper jury instructions and argument from counsel. Let me ask you this following on this claim of right issue. I agree with you. There doesn't seem to be any Ninth Circuit case law that expressly deals with some of these issues, but there is a First Circuit case called Strum. You're undoubtedly familiar with Strum, are you? I've read it, but. Okay, the reason I ask that is because that case suggests in this context that even though there may be a claim of right under certain circumstances, that if the means to obtain the property was inherently wrongful, that there is no right to an, in quotes, claim of right. Does that sound like an appropriate formulation to you of what the Congress has said in Hobbs? Yes. Okay, so if that's the case, and if taking, for example, the charitable deduction, I mean the charitable receipt, that's inherently wrongful, isn't it? It has nothing to do with Ms. Ortiz's employment. As best as I can tell, no, that one request did not have anything to do with her employment. Okay, so in that case, then, that would be inherently wrongful under the Strum standard, would it not? It could, but I don't know that it invalidates all the other statements that he made and all the other requests that he made. In a criminal prosecution of this nature, do you have to validate all of them? Or is, don't we follow the Jackson approach, that as long as you could show that there would, you know, any reasonable juror could conclude that there was proof beyond a reasonable doubt that this receipt was done or asked for, and it didn't qualify under the Strum approach, isn't that enough? If this were a sufficiency issue, yes. Again, the question is whether the existence of that one request allowed the district court to say, none of your defense is valid, and I think that's the problem that I'm having. I understand what your point is, but I don't think that one request invalidates the entire rest of the defense. If we focus only on the amount of wages paid and then kicked back, I'm leaving it to one side for the moment, the charitable contribution. Done in an unlawful way or an improper way, it doesn't sound as though the only thing that Villalobos was saying on behalf of his client is, listen, pay up or we'll tell the truth. It's, if you pay up, we'll lie. That's different from pay up or we'll tell the truth, otherwise we will remain silent, appear only upon subpoena and so on. No, he was saying, we'll lie if you pay us. So it doesn't look as though he's done that in a perfectly lawful way. He's going beyond merely saying pay up and we'll just fulfill your obligations. He's saying pay up and we'll lie for you. I'm at two minutes and I want to answer that question and then sit down and wait. We'll give you a chance to say what you need to say, so feel free to answer and we'll give you two minutes. Thank you, Your Honor. If you really read what he said carefully and go through the transcript and see what he said, he was really very vague about almost everything. You know, she'll say the truth, she'll shade it the way we want to shade it, whatever. And the one place I could find that there was actually an allegation of a lie was actually an omission. It was, I believe, in 823.11 in the section of like pages 145 to 155 in there, where she said basically she wouldn't tell the U.S. attorney about the forced kickbacks. It wasn't actually going in and lying. In fact, in terms of the visa fraud, she couldn't really come up. I guess she could go in and lie and say, no, I came here on my own accord, but there was never any discussions that she was going to do that. But you're arguing insufficiency here, aren't you, counsel? I mean, the reality is testimony was laid before the jury, showing what had been said to counsel for the rabbi, et cetera, and the jury didn't believe your client, basically. You're arguing that there was insufficient evidence for the jury to have concluded the way it did? I'm not arguing that on the extortion charge, but I am. You know, I do also raise in my brief that there was quite a bit of testimony by prosecution witnesses that they believed that Mr. Diallobos was lying and engaging in extortion and promising lies, even though if you actually read his words on the tapes with Mr. Gluck, there are not expressed promises to have his client lie. I think the judge gave limiting instructions on those comments, did he not, about what the agents testified? I'm not recalling that he did. Okay. Thank you, Your Honors. Let's hear from the government, and we'll put two minutes on the clock for you. Thank you so much. Good morning, Your Honors, and may it please the Court, Mark Yohalam on behalf of the United States. I wanted to start for a moment with a brief factual description of what the arrangement was between the rabbi and the angels, because I think it was a little bit muddied before, which was that Orit Angel would be presented as a religious worker for the purpose of getting a visa, that she would then work in some very limited capacity and would get paid for that work. And, in fact, she was paid for that work and didn't have to kick it back. Counsel, just so I'm understanding the facts correctly, there's been some discussion of $100,000 to $120,000. Is that approximately what the record shows she was paid? Yes. Okay. So she was paid for a period of time. She was given a salary that looked like she was working a full-time job, when, in fact, as she herself testified, she would work a couple days a week for a couple hours a week doing fundraising by phone. That money she was ultimately allowed to keep, the money that she actually earned doing that and the money that she actually earned when she was for a short period of time acting as a teacher's assistant. Again, working about 40 hours a week, 40 hours a month, some months working 20 hours a month. She got to keep $800 a month during that period. But there was a representation that she was able to make on her tax forms that she was getting paid much more than that. That representation she could then use to support her visa application. So it wasn't that she was working. The classic sort of case where I think the government aggressively prosecutes and the court rightfully thinks is outrageous and the public thinks is outrageous is when a person comes over and works slave hours for slave wages under the threat that if they don't continue working, they'll be turned over to immigration and deported. That's not at all what was going on here. This was a mutually beneficial fraud and really, frankly, mostly beneficial to the angels and not to the rabbi. And just to clarify one other point, the rabbi was prosecuted. He ultimately got diversion, but the government did prosecute him. So I didn't want the court to be under the impression that he was not prosecuted. The other area I want to clear up is the assertion that there's nothing in the record to show that she was actually promising to lie. The record is replete with repeated statements where he says she'll say whatever we need her to say, however we need her to say it, that she would say that she had worked full-time and been paid for a full-time job. That's the essential lie, that she had worked as a religious worker. That's the essential lie. Those are the lies that would make it seem that there was not a visa fraud going on in her case. Let me understand what the evidence showed with respect to the money paid for work that she did not perform. Was that paid and then kicked back, or was that not paid at all? What does the evidence show? It was paid and then kicked back, Your Honor. Let me ask you, counsel, since at least the defense counsel claims, and I'm inclined to agree, we don't have any authority that directly addresses the claim of right issue in this particular context. Does the government agree with that in the Ninth Circuit I'm talking about? Yes, that's correct. So if the government had its druthers, how would the government formulate the claim of right in this context, and would illegality of a means of achieving an end frustrate that claim of right? Well, let me begin by saying that it's the government's view that there is no free-floating claim of right that hovers over the entire Hobbs Act. There is a narrow claim of right defense that the Supreme Court recognized in Inman's that this Court in Dane and Thordarson said is limited to the labor dispute context. And the reason why that claim of right defense exists, it's not really actually a claim of right defense. That was language that was used in Inman's, but what Inman's was doing is looking at the legislative history of the Hobbs Act, and it appears that Congress really did believe that violence used during a lawful strike would not be covered by the Hobbs Act. Well, let me ask you this. You say just in the labor context. Let's change the facts of this a little bit. Let's say that Mr. Villalobos, instead of doing what he did, said, look, you know, you took some money from my client. I want that money back, but she's got to pay my attorney fees, and I want you to pay my attorney fees, and my rates are $4,000 an hour. So here's the rate, and I want you to pay that. Would that qualify as a claim of right in a labor context? Well, I guess what my answer is, I don't think that's how the claim of right works in the labor context. I'll take it out of the labor context. I'm just saying in an extortion context. Could Mr. Villalobos say, look, I'm just trying to get this money back from my client here. I don't want to have to pay me. I'm going to just ask for my fees. That happens all the time in attorney negotiations. No, I don't think there would be a claim of right. So I think if what had happened was that the workers at the Chabad Center unionized and went on strike, and while on strike held placards saying we're going to report you to the FBI, then I think under Inman's, there would be, it's not really a claim of right. It would just be an absolute defense that this was in the context of a labor strike. The First Circuit case Sturm says that if it's a purely economic threat, then there's a claim of right. But there's no question this case is not a purely economic threat. Beyond that, no federal court has recognized a claim of right defense. Some state courts in decisions well after the Hobbs Act was enacted have expanded the claim of right defense to include other contexts. But at the time the Hobbs Act was enacted, state law was universally the case, as the Second Circuit explained in Zappola, that a threat of criminal prosecution or the exploitation of the fear of criminal consequences did not give rise to a claim of right defense. And in Dane, this court endorsed that exact passage in Zappola. Now, it happens that the court in Dane ellipses out that portion of Zappola because that wasn't the issue in Dane. So I don't think it's... Let me stop you because that doesn't sound right to me. You're saying that if I have a legitimate, you have property or money of mine that I believe you wrongfully took from me in such a way that it might be actually a criminal offense, that in the course of my demand to get it back, I can't say, and if you don't return my property, I'm going to report this to the authorities? I think the state of the law at the time the Hobbs Act was enacted, that was the state of the law. Now, I agree with Your Honor that in sort of the quintessential case of, you know, I steal your bicycle, you come to my house and say, look, give me my bike back so I don't have to call the police. That doesn't seem like an extortion. Because it's... I thought the limiting principle that you were going to articulate is that you are... you want from the person you're trying to extort or allegedly trying to extort. As long as you don't engage in any means that are inherently wrongful, then you're okay. But as soon as you cross the line and, for example, the threat of violence that's just deemed inherently wrongful, it doesn't matter how legitimate your claim to get the property is, you can't threaten to kill somebody to get it back. I mean, that's not... We're not going to sanction that. And I thought you were going to say that we just are in the same boat here. What she was threatening or what the lawyer was threatening to do on behalf of his client was inherently wrongful. There's no court that would sanction that. It's okay. And that's why you don't... you weren't entitled to the instruction. Well, I would say that that's sort of my second line of defense. So I think the outer line of defense is that there has... no court, federal court, has recognized the claim of right defense generally existing in the Hobbs Act. If you were to... How can you say that, Counsel? In Dane, which admittedly was in a different context, the court cited the Second Circuit's Zappala case, which concluded, in quotes, Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, regardless of the defendant's claim of right to the property. Now, that's not our case, but we cited it with approval. Why shouldn't that be the standard that we'd be looking at here? We're not ruling out a claim of right in certain contexts, but using inherently wrongful means takes you out of that coverage. The full quotation from Zappala is inherently wrongful means such as threats of criminal prosecution, regardless of the defendant's claim of right. No, it's not an exclusive list, but, I mean, for example, the defense counsel has conceded the fact that claiming a charitable deduction has nothing whatsoever to do with Ms. Ortiz is inherently wrongful. So doesn't the Zappala language, if not certainly the reasoning, fit into the proper context in this circumstance? Yes. I think if the court were inclined to say that there is generally a claim of right defense within the Hobbs Act, then I think the fallback position would be twofold. One is that some of the things she was demanding, I'm sorry, that the defendant was demanding on Orit Angel's behalf, she indisputably did not have a claim of right to. Now, today defense counsel has conceded the charitable deduction, but I think actually the stronger one is the no-show job that she demands. Inman specifically says that Congress passed the Hobbs Act to stop workers from demanding with threats that employers give them jobs that the employers don't want to give the workers. And so this is actually as squarely within what Congress meant to stop in the Hobbs Act as you could get. Was there any dispute at trial as to the factual proposition that you laid out at the beginning, that is to say for the work that she actually performed, she was paid and not required to kick back, and that she was required to kick back only payment for work that had not, in fact, been performed? Was there dispute about that at trial? Sort of. So Orit and Avi Angel both testified. Orit is the wife. Avi is the husband. Avi is the one that defendant described as a street-savvy worker who knows exactly how to work this thing. She says he's the one who handled all of it. Right. And Orit is sort of depicted at least as the innocent wife who didn't really understand what was going on. Orit conceded under cross-examination that she was allowed to keep the money for the work she performed, while Avi claimed that they had to kick everything back on direct examination. And then under cross, I believe, said he had no recollection as to whether he was allowed to keep any of the money. So there was a dispute in that sense with respect to that money. There was no dispute about the fact that defendant demanded the charitable contribution and the no-show job. Now, those weren't recorded calls. They weren't allegations. They were recorded communications. Even if we see that there's a dispute as to how much money was asked for in return, that is to say whether some of the money that was asked for by the rabbi was for work that she had performed, it seems as though there's no dispute that when Villalobos is asking for money, a fair amount of that money that he's asking for is money for work that she never performed. That's correct, Your Honor. And so that would be half of why there should be no claim of right defense, which is just there's no claim of right. The other half is, to go back to where Judge Watford started, is that the means used here are not the sort of paradigmatic, you show up to the house and say, give me back my bike or I call the police. It's that, you know, I've already called the police. The police are coming to your house to arrest you, but I can now call them and say it was all a hoax, you know, if you pay me $1,000 and give me back my bike or something like that, which is quite a bit beyond merely saying I will report a crime. And part of the reason why that's so is that it's not just that she's asking for money she's not owed. It's not just that she's offering the obstruction of justice as well. It's that there actually isn't really a connection between the federal investigation and the nonpayment of her money. The federal investigation is into the fraudulent representation that she would be a full-time religious worker and that these other workers, such as Malcadasa, would be full-time religious workers. That has nothing to do with whether they were paid or not paid. If she's paid a million dollars to do telephone solicitations for fundraising, she's still not a full-time religious worker. If she's given a no-show job or not, she's still not a full-time religious worker. So there isn't a nexus in that sense. And an easy way to see that is if you flip the circumstances. Now, my opposing counsel said that one of the defendant's theories was that the angels were in fact being extorted with the threat that the rabbi would turn them over to immigration if they didn't kick back the money. Again, the government's view of that is that that is not what happened. But the fact that she characterizes that as an extortion reveals why what the angels did and what the defendant did was also an extortion, which is that if what the rabbi said is, our deal is you kick back the money to me, and if you don't kick back the money, then I'm going to tell immigration, again, that's an extortion. There isn't a nexus between the visa crime that he would be revealing and their private decision about an agreement about the work that would be performed and the payment that would be made. Is a nexus required? Yes, it is, Your Honor. And the courts that have recognized a claim of right to fame, for example, the Second Circuit in Jackson, have talked about and the state courts that have recognized it, have said that where you're threatening to report a crime, there has to be essentially the threat to report the crime has to be to correct the same wrong that would otherwise be corrected by the payment that you're asking for, which is like the give me back my property or I call the police. Well, that's what I think the quote you have from Zappolo is talking about, right? I mean, that's just the mere threat of criminal prosecution if it's connected to the dispute that I'm trying to resolve with you. There's nothing wrong with that. But obviously, if you're saying, well, I'm going to report some, or even worse, I'm going to make up some totally unrelated crime that you committed, then I'll report that if you don't give me. I mean, everybody would recognize that that, again, is inherently wrongful. Yeah. I mean, I think in some contexts, even the threat of reporting someone where there is a bona fide dispute could be wrongful. And, again, it's the government's view that there isn't this generalized claim of right defense. But I can see that I'm not getting traction with that argument. So I'm happy to fall back on, you know, the alternative point, which is simply that the means here weren't proper. Well, and the claim of right is pretty narrow. If she is asking for money back, for money for a no-show job. Yeah, I think that's right, Your Honor. Thank you. Thank you so much, Your Honor. All right. Getting to your very last comment, Judge Fletcher, I actually do not agree, and this wasn't covered very explicitly in the statement of facts in the briefs, but I don't agree that it's uncontested that most of the money that was kicked back was for a no-show job. What's the evidence as to how much time she worked? I'm not 100 percent clear on that. It was a little vague. Unfortunately, the government fought pretty hard to keep the rabbi off the stand, so it came in through Orit and Avi, neither one of whom was a particularly great witness. And so there was definitely evidence that she worked, that there were time cards, there were pictures of her with the preschool children, but there was not a lot of detailed evidence about how many hours she worked and how much of the money was legitimately earned as opposed to. Is there testimony from her that she was paid for the work that she did perform and also paid but required to kick back money for work that she did not perform? Her testimony, as I recollect, was pretty vague on that point because her husband was receiving the paychecks. So it was one of these family situations where she didn't see. I don't even know if she knew how much she was getting paid. What was her testimony as to how much work she actually performed? That she would have known because she did it. Right. It was, I apologize, Your Honor. I know there was some testimony that's listed in my opening brief, and I think there was, you know, sometimes she was working 20 to 40 hours a week, depending sometimes on calls, sometimes. I just heard a month. Pardon? I just heard from the prosecutor 20 to 40 hours a month. I know. That's what they said, and I disagree. I believe there was some proof that she was actually working more than 40 hours a month. I'm not asking for proof. I'm asking for a recitation of her testimony as to how much time she worked. And I don't have that at my fingertips. I can certainly submit some supplemental on that. I can go back and read the testimony. But I want to make sure the court understands that it is contested about whether she was taking back only money that was unearned. But some portion of it you concede was not worked, right? No, I don't. Oh, you don't? No, we don't concede that at all. And some of the information about that, this is my other concern, which I also raised in my reply brief, the government's actually reciting facts from the probation report, which is background information that was used at sentencing, but it wasn't presented at trial. I'm with you on that point. That's off the table for this purpose. Right, but that has to do with the agreement between the rabbi. What was the agreement between the rabbi and the angels? I don't believe there was. Now, I've got to go back and read this. It would be crucial for my decision. But my impression of the evidence is that the amount of money asked for by Attorney Lobos, the totality of that amount cannot be accounted for by the number of hours that she testified she worked. I disagree, but I cannot point you to the place in the record, and I apologize for that. It's resolvable. We'll go back to another record. Okay. Because I do recall that there was a sincere effort by the defense to try to show that she was working quite a few legitimate hours. Yeah, but that's different from saying all of the money that, you know, he almost has asked for is money accounted for by the hours that she actually worked. Understood. The only other point I wanted to make very quickly is that as Judge Watford was asking about what's a, you know, how would you formulate a claim of right and can't you just go up to somebody who stole money from you and say give me the money back or I'll call the police. And I can't imagine a world in which that is always going to constitute extortion. You know, it happens all the time. In California, they have a thing in the state courts, civil compromise, that parties reach a lot of times in smaller cases where you can say pay me back the money you owe me and we'll take the prosecution off the table. That can't be a Hobbs Act violation. Thank you very much, Honors. Thank you both sides for your useful arguments. The United States versus the Lobos now submitted for decision.
judges: Fletcher, Smith, Watford